## CAESAR HARRIS v. THE STATE.

### No. 1817.    Decided December 7, 1898.

**1.  Continuance.**

On the 14th of July defendant's application for continuance was overruled, but the case was then, on account of other matters, postponed until the 25th of July, and a new subpoena issued for the witness. On the 25th the defendant announced "ready for trial," and voluntarily went to trial without objection, though the subpoena issued on the 14th for the witness had not been returned, and made no renewal of the application for continuance, nor did he call the court's attention thereto. Held, he could not be heard to object to the overruling of his application for continuance made on a former day.

**2.  Same—Immaterial Evidence.**

A continuance will not be granted for immaterial testimony, or for testimony which could not possibly avail or benefit defendant.

**3.  Wife Murder—Evidence Sufficient.**

See opinion for facts stated which are held amply sufficient to support a judgment of conviction for murder in the first degree with the death penalty, the deceased being the wife of the defendant.

**4.  Same—Murder in the First Degree—Motive.**

A murder accomplished under circumstances which show a formed intent to kill, and which was perpetrated with sedate, deliberate mind, is none the less murder in the first degree because the motive or actuating cause which brought about the homicide, to wit, infidelity of the wife, was calculated to inflame defendant's mind and excite his passion.

**5.  New Trial—Disqualified Juror.**

Where a motion for new trial, supported by affidavit, was based upon the disqualification of a juror who had qualified himself and who sat upon the trial, upon the ground that twenty minutes before the jury was impaneled said juror was heard by affiant to say, in his presence and in presence of one V., that defendant ought to be hanged, and the State traversed said affidavit by the affidavits of the juror and V., who denied the statements made in said affidavit, Held, the motion for new trial was properly overruled.

APPEAL from the District Court of Brazoria. Tried below before Hon. T. S. REESE.

Appeal from a conviction for murder in the first degree; penalty, death.

The indictment charged appellant with the murder of his wife, Susan Harris, on the 15th of June, 1898, by shooting her with a gun.

The opinion summarizes the important facts.

*F. J. & R. C. Duff*, for appellant.—There is not sufficient evidence to establish express malice; and the evidence does not establish beyond a reasonable doubt the existence of express malice in the mind of the defendant at the time of the commission of the homicide.

"Express malice is where one with a sedate and deliberate mind and formed design unlawfully kills another; which formed design is evidenced by external circumstances discovering that inward intention; as lying in wait; antecedent menaces; former grudges; concerted schemes to do the person slain some bodily harm, which might probably end in the death of the person upon whom same was inflicted.

"It is the act by which one doth kill to which the formed design must refer, and not the fact of the killing. Nor, on the other hand, does the mere design to kill, without lawful excuse or justification, however fully formed and firmly fixed in the mind, constitute of itself express malice. For the design must originate in, or result from, a sedate, deliberate mind." 4 Blacks. Com., 189; McCoy v. State, 25 Texas, 38; Murray v. State, 1 Texas Crim. App., 422; Halbert v. State, 3 Texas Crim. App., 660; Walker v. State, 14 Texas Crim. App., 630; Richarte v. State, 5 Texas Crim. App., 362.

While the law implies malice on proof of voluntary homicide, it does not impute express malice. Express malice must be shown by satisfactory evidence, and the burden is on the prosecution to establish it affirmatively, so that no reasonable doubt as to its existence in the mind of the defendant shall remain.

We deduce from these general principles the following conclusions: 1. That where the evidence establishes merely a voluntary unjustifiable homicide, the law imputes malice; this is denominated implied malice, and the homicide will be murder in the second degree. 2. That in order to sustain a conviction for murder in the first degree express malice must be established aliunde the mere fact of killing, by satisfactory evidence; that is, "it must be proved aliunde like any other fact in the case, by such evidence as might be reasonably sufficient to satisfy and convince the jury of its existence." Richarte v. State, 5 Texas Crim. App., 363, and authorities there cited.

Do the external circumstances, the acts, words, or conduct of the defendant, furnish satisfactory evidence that at the time of the killing he had in his mind a formed design to kill, and that this design was formed with a sedate, deliberate mind? We think not. Were it not for the testimony of the defendant himself, the killing would be totally without explanation or known cause. Evidently none of the persons present, inclusive of the deceased herself, gathered from the acts, words, or conduct of the defendant, during the half hour that he was in conversation with his wife, the slightest inkling or suspicion that he intended doing her any hurt or harm. The nature of man is such, we believe, your honors, that when the awful design to murder penetrates the human bosom, all the currents of his being are turned awry,—his faculties undergo an internal insurrection; sleep flees the eyes or palsy falls upon

the limbs; the spirit will revolt; the face grows haggard; and in the presence of the victim, conscience will hang out some sinister sign apparent to the watchful eye, whereby is disclosed the fearful purpose.

But nothing, it appears, in either the words or behavior of the defendant, up to the very moment of the shooting, occurred to arouse a suspicion in the minds of any of the persons present that the defendant had a determination to take the woman's life. Therefore, we are impelled to the belief that in fact that design was only formed at the very moment of the killing. If this be true, if your honors arrive at a like conclusion, thus fixing the very time of the forming of that design, it remains but to inquire what was the condition of the defendant's mind at the moment that the design was formed.

To determine this the testimony of the State's witnesses is worthless. They show no cause of an excited mind, but on the other hand, they disclose no possible reason or cause for the killing, and tell nothing from which express malice may be considered established. The testimony of the defendant himself, offering as it does the only explanation for the act, also furnishes sufficient and to our minds satisfactory evidence that at the time that the design to kill was formed, it was morally and mentally an impossibility for him to be in the possession of a sedate, deliberate mind, or to be able to reason, or indeed to think intelligently.

The explanation is strange,—is anomalous; yet can anything be stranger, more unusual, than the crime?

It seems that the couple had been married but some sixteen months. For about one year they lived together, and all was well. But they were soon to learn that there is no picture hanging on the wall of time so pleasing or so fair but that the fell finger of fate may not blot or destroy all its loveliness. It may have been that some foul spirit, slipping past the portals of Inferno, walking on the earth, and mischief bent, beheld with gangrened heart the felicity of this humble Eden. Be it as it may, the woman fell. Frail and confessedly false, she abandoned her husband and her home, and sought a life of infamy and sin. It was to reclaim her erring feet that the defendant approached her on the morning of the 15th of June. It was to pardon all; it was to forgive and forget. This, we are informed from his testimony, he sought to do; he tried to persuade her; to get her to quit her conduct; to come home. Unshamed by his magnanimity, untouched by his affection, undeterred by his remonstrances, she repulsed his well-meant efforts, and, to the shame of womanhood, flaunted new instances of her perfidy in his face, lacerating with bitter scorn the heart and hand extended to raise her from the depths of her degradation.

Then it was, as we believe, your honors, the heart and mind, crushed beneath this weight of woe, broken and despairing, conceived the thought that death itself were better far for her than such a life of infamy. For he says, "I killed her because I loved her; when I killed her I loved her; but I would rather see her dead than living like she was."

Ah, your honors, we may call this murder. In that elder day when

Virginius snatched his daughter from the lustful arms of Appius Claud-
ius, and took her life, holding it cheaper than her pure fame, it was called
a sacrifice.

At such a moment could the mind of mortal man be sedate or deliber-
ate? Would there not rather be a seething, raging maelstrom of conflict-
ing passions and emotions in the mind and bosom? The roar of battle,
the crashing thunderbolt, scenes of carnage, fire, flood, and destruction,
all rolled and blended into one, could not strike into the human heart
more of horror, more of despair, sorrow, rage, and anguish.

We do not know, we can not say, how a man should act under such
circumstances as these. But if reason itself, shaken ,by such fearful as-
saults, should tremble upon its throne, totter and fall, and in the crash
involve the life of her who has undermined it, it is not a fault for which
the miserable man should suffer the extreme penalty of death.

A sedate, a deliberate mind! Five thousand years of history do not
afford the story of a man whose mind could sedately deliberate when con-
fronted with such circumstances as these. It only tells of weak human-
ity, which "when wrought upon, is perplexed in the extreme;" whose
passions, goaded by the lash of shame, rush forth like seething torrents;
whose affections and confidence abused, their fruit is turned to bitter-
ness and ashes; whose hopes shattered, whose happiness destroyed, whose
future blighted, whose homes ruined, the demon of despair runs riot in
their bosom, and they with their own rash hands pull down the edifice
of their hopes, and expire amid its ruins. Such a case it is your honors
are engaged in trying.

*Mann Trice,* Assistant Attorney-General, for the State.—Practically
but one question is presented, and that is as to the sufficiency of the evi-
dence. It appears that appellant and his wife (the deceased) had been
separated for some time; that appellant had some weeks before the kill-
ing visited the office of the county attorney to make inquiry as to when
court met, stating that he wanted to file suit for divorce against his wife,
and stated that he was going to get rid of her if he had to kill her. He
stated this to County Attorney Loggins, and also to Foster Johnson.
Foster Johnson told him not to kill her, but if he did not want her to let
her alone, and let some other man have her. The defendant, reading out
of a law book, told Johnson he would only get from five years to life if
he killed her. At the time of the killing deceased had a baby in her lap,
and defendant took the baby out of her lap, then got his gun, and de-
liberately killed her. The circumstances surrounding the killing show
the utmost coolness and deliberation. His conduct and threats before
the killing presents murder upon express malice.

HENDERSON, JUDGE.—Appellant was convicted of murder in the
first degree, and his punishment assessed at death; hence this appeal.

Appellant reserved a bill of exceptions to the action of the court in
overruling his application for a continuance. The application was predi-

cated on the absence of Dr. John Harris. By reference to the bill it will be observed that the case was first called for trial on the 14th of July, and that the application for continuance was then overruled. On account of a defect in the service of the venire, the case was then postponed until July 25th. Another subpoena was issued on the 14th of July for the absent witness, but had not been returned at the time of the trial. The application for continuance was not renewed at that time, nor called to the attention of the court. The court explains that when the case was called up again, on the 25th of July, the defendant announced "ready for trial," and voluntarily went to trial without objection. Before appellant could have availed himself of an error of the court in overruling his motion for a continuance, he should have presented said motion when the case was called on the 25th of July. He could not have availed himself of the action of the court on the preceding 14th of July, as it is shown he voluntarily went to trial on the day when the case was reset. Moreover, when we look at the evidence expected to be proved by the absent witness, we fail to see how it could have availed the defendant. Instead of availing him, it occurs to us that it would have been additional evidence to establish a malicious killing on his part. He proposed to show by the absent witness that the deceased, some time prior to the homicide, procured poison, alleging that she was going to mix it with whisky and kill him (defendant).

Appellant urgently contends that this case should be reversed because the evidence is insufficient to establish beyond a reasonable doubt a killing upon express malice. We can not agree to this contention. The evidence not only shows a grudge on the part of defendant against the deceased (his wife), as he claims, on account of her infidelity to her marital vows, but also that he expressed his intention to kill deceased some two days before the homicide occurred. He went to the office of one Loggins, county attorney, and asked him when court would convene; and, when he was informed that it would meet in about two weeks, appellant "said he wanted to know, because he wanted to get a divorce from his wife; that he was going to get rid of her in some way, if he had to kill her." In addition to this, preparation is shown; for the record furnishes no other explanation of his having and carrying a gun to the scene of the homicide than with the object of killing his wife. When he arrived at the scene, he appears to have acted with great coolness and deliberation. He first set his gun down by the corner of the house, and then engaged in conversation with his wife, who was sitting on the front steps of the house, with the baby of Lillie Williams in her lap. He asked his wife where she was going on the 19th of June (Emancipation Day) ; and she replied that she was going to Oyster Creek, to a celebration, and asked him where he was going. He replied that he was going to town, and asked her what she wanted. She requested him to bring her a white dress, trimmed with red ribbons; and he said, "All right." He then took the baby out of her lap, and placed it on the ground. He first started to

put it down in the sun, but the mother of the child, who was present, asked him to put it in the shade, which he did. He then stepped to the corner of the house, where he had placed his gun, picked it up, stepped out in front of the house, and shot his wife in the side. He used a double-barrel shotgun, and the wound inflicted caused her immediate death. As soon as he shot her, he turned and ran away. All of these circumstances, to our minds, are indicia of express malice. It does not appear that the killing occurred on his first being informed of his wife's unfaithfulness. The testimony shows otherwise, although in his own evidence he states that he had some conversation with her, just before shooting her, with regard to her intercourse with a particular person named, and he says that this was the occasion of his impulse to kill her. But the jury evidently did not credit his statement,—and from the record we think they were justified in discrediting it,—and believed that he had already made up his mind to kill her before he came on the place. Counsel for appellant strenuously insist that the moving cause that actuated appellant in slaying his wife was her alleged infidelity, and that this unsettled and unbalanced his mind to that extent that the killing was not, and could not have been, with such coolness and deliberation as characterizes a killing upon express malice. Concede that the conduct of his wife was calculated to inflame his mind, yet, as stated, he was evidently aware of this for some time; and he evidently formed the intent and purpose to kill her some time before the homicide, and he went about the accomplishment of his object with that coolness and deliberation of mind which characterize a killing upon express malice. We do not understand the law to be, because the motive or actuating cause which brought about the homicide was of a character to influence and excite passion, that, when the killing is shown to have been accomplished under circumstances which show that the intent to kill was formed and the purpose accomplished in a sedate and deliberate mind, it would be any the less murder in the first degree on account of the operating cause which instigated the homicide.

Appellant raises a question as to the fairness and impartiality of one of the jurors who tried the case. In connection with his motion for a new trial on this ground, he appends the affidavit of McKelvey, who states that he heard the juror Henry Turk, on the day of the trial, and about twenty minutes before the jury was impaneled, say that the defendant ought to be hanged. In this connection he refers to another party, to wit, William Volbaum, who, he says, heard the juror so express himself. The motion for a new trial shows that the juror, when questioned, qualified himself to sit in the case, and was taken as juror. The State, in reply to this motion, presented the affidavit of the juror himself, who traversed and denied the affidavit of McKelvey; and this was supported also by the affidavit of Vollbaum, who states that he heard no such remark by Turk. These affidavits were all before the court, and he very properly, we think, overruled the motion for a new trial on this ac-

count. In regard to the suggestion contained in the record that the juror Barron separated himself from the other jurors, as explained by the court, there is nothing in it. There being no error in the record, the judgment is affirmed.

*Affirmed.*